# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-276V
**Filed: November 20, 2018**
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                              *
CHRISTINE SMITH,                              *
                                              *
              Petitioner,                     *     Findings of Fact; Onset;
                                              *     Shoulder Injury Related to
       v.                                     *     Vaccine Administration
                                              *     ("SIRVA").
SECRETARY OF HEALTH                           *
AND HUMAN SERVICES,                           *
                                              *
              Respondent.                     *
                                              *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Joseph A. Vuckovich, Maglio Christopher & Toale, Washington, DC, for Petitioner.*
*Robert P. Coleman III, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ONSET[1]

**Oler**, Special Master:

On February 28, 2017, Christine Smith ("Ms. Smith" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program").  The petition alleges that the influenza ("flu")

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

vaccination Ms. Smith received on October 16, 2014 caused her to suffer from immediate pain in her left shoulder.  Petition at 1.

During the pendency of this matter, Petitioner submitted two affidavits that she authored, along with affidavits prepared by her son and daughter, as well as other documentary evidence. The facts Petitioner presented in her affidavits relating to the onset of her medical symptoms differed from those documented in Petitioner's medical records.  When discrepancies exist between medical records and affidavits, "Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing." *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006).

Accordingly, I held a hearing on August 22, 2018, by video teleconference ("VTC") in Washington, DC, to determine the date of onset of Petitioner's shoulder injury.  Mr. Joseph Vuckovich appeared on behalf of Petitioner and Mr. Robert Coleman appeared on behalf of Respondent.  I heard testimony via VTC from Petitioner, her son, Mr. Paul del Valle, and her daughter, Ms. Maria Torres.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and documentary evidence, I find that the contemporaneous medical records more accurately reflect the onset of Petitioner's pain than the affidavits and other evidence submitted on her behalf. Specific factual findings are set forth in detail below.  In summary, I find that Petitioner displayed symptoms of left upper arm pain beginning in November of 2015.

## I. Procedural History

On February 28, 2017, Petitioner filed a petition alleging that she suffered from Shoulder Injury Related to Vaccine Administration (SIRVA) as a result of a flu vaccine administered on October 16, 2014.  Petition, ECF No. 1.  Petitioner filed medical records on February 28, 2017, August 23, 2017, October 11, 2017, and August 13, 2018.  ECF Nos. 4, 14, 19, 36.  Petitioner filed her first affidavit on April 14, 2017.  Ex. 7.

On September 22, 2017, Respondent filed a Rule 4(c) Report.  ECF No. 15.  Respondent states that Petitioner has not provided evidence that satisfies her burden of proof under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005), specifically noting that she did not seek medical attention for her shoulder until thirteen months after receiving the allegedly causal flu vaccination.  Resp's Rept. at 5.  Respondent further states that Petitioner's "complaints of numbness and tingling in her left arm and left hand point to her '[n]europathy in arm- x-ray neck stenosis' as a potential alternate cause" of the pain in her left arm.  *Id.* at 6.  Respondent concludes that "[P]etitioner has failed to demonstrate entitlement to compensation and her petition for compensation should be dismissed."  *Id.* at 7.

On October 4, 2017, Special Master Moran, the special master previously assigned to this case, ordered Petitioner to complete an affidavit answering a series of questions concerning prior medical treatment, employment, documentation in her possession, and activities.  In his order on this same date, Special Master Moran stated that "a hearing to receive oral testimony may be

appropriate." ECF No. 18.  Petitioner submitted a supplemental affidavit containing answers to Special Master Moran's questions on November 9, 2017.  Ex. 10.

On April 4, 2018, Petitioner submitted an affidavit from her son, Paul del Valle (Ex. 11). On August 13, 2018 she submitted an affidavit from her daughter, Maria Torres (Ex. 14), as well as a Christmas card purportedly written and sent in late December 2014 (Ex. 15).

I issued an order on April 26, 2018 scheduling a fact hearing in this case to determine onset of Petitioner's injuries.  ECF No. 34.  I conducted the hearing on August 22, 2018 in Washington, DC.  At the hearing, Petitioner submitted the original of the Christmas card that was purportedly written and sent in late December 2014 (Ex. 16).  Petitioner filed several documents after the fact hearing, to include handwriting samples (Exs. 17, 18), payroll paperwork (Ex. 19), and a group of Christmas cards (Ex. 20).  The matter is now ripe for adjudication.

**II. Petitioner's Medical Records**

Petitioner was born in 1958.  She was 55 years old on October 16, 2014, when she received the allegedly causal flu vaccination in her left deltoid at Our Lady of Victory (OLV) Family Care Center in Lackawanna, New York.  Ex. 1 at 11-12.

### A. Petitioner's Medical History Prior to the Flu Vaccination

Petitioner's past medical history included gastroesophageal reflux disease (GERD), high blood pressure, high cholesterol, diabetes, allergic rhinitis, and pharyngitis.  Ex. 4 at 5.

### B. The Flu Vaccination and Petitioner's Subsequent Medical History

After receiving her flu vaccination on October 16, 2014, Petitioner did not seek medical care until August 3, 2015.  Ex. 4 at 18.  On that date, she visited Danielle Minazzi, a family nurse practitioner ("FNP") at OLV Family Care Center.  The reason for the appointment is listed in the medical records as "lab results".  *Id.*  Further, in the examination section of the record, it states, "Constitutional: in no acute distress, looks well."  *Id.* at 21.  There is no mention in the medical records associated with this visit of any type of arm or shoulder pain.  *Id.* at 18-21.

On August 6, 2015, Petitioner went to Mercy Hospital of Buffalo's Emergency Department.  During this visit, she reported as follows:

> [S]he was at work 2 days ago lifting a heavy linen ba[g] and 'strained' her neck.  Patient reports she had no pain at the time she was lifting the bag but her neck became progressively more stiff, especially to the left, over the course of her shift.  Today patient went back to work and lifted more heavy objects causing her pain to become worse.  Patient reports with the heavy lifting she has pain and tenderness to her neck radiating as tingling sensation to her left fingers.

Ex. 13 at 20.  Notes from this visit specifically indicate, "[n]o tenderness or pain in the left shoulder."  *Id.* at 21.

On August 19, 2015, Petitioner had a mammogram and received a recommendation for a right breast ultrasound.  Ex. 4 at 94-95.  Petitioner had another mammogram on October 8, 2015.  Ex. 5 at 7.

On October 19, 2015, Petitioner presented to the Emergency Department at the Mercy Hospital of Buffalo with symptoms of cough, difficulty breathing, arthralgias, myalgias, and no appetite.  Ex. 13 at 43.  She was diagnosed with pneumonia.  *Id.*  Of note, the medical records from this visit indicate that her "range of motion [was] intact in all extremities."  *Id.* at 39.  There is no indication in the records that Petitioner mentioned that she was experiencing left arm or left shoulder pain during this visit.

On November 16, 2015, Petitioner again visited FNP Minazzi at OLV Family Care Center.  Ex. 4 at 15.  The reason for her appointment is listed as "ER [f]ollow up (October 2015)".  *Id.*  Under history of present illness, the record indicates, "states left arm pain in muscle states pain since feels a lump."  *Id.*  Upon examination, FNP Minazzi noted "left upper arm full rom [range of motion] mobile tender area on deep palpation."  *Id.* at 17.  FNP Minazzi referred Petitioner to John Callahan an orthopedist; the stated reason was "mobile tender lesion felt."  *Id.*

Petitioner went for an office visit at OLV Family Care Center on December 16, 2015 for "lab results."  Ex. 4 at 10.  The history of present illness ("HPI") section of the medical record states, "neuropathy in arm -- xray neck stenosis."  *Id.* at 10.  FNP Minazzi assessed her as having neuropathy and left upper arm pain.  *Id.* at 14.

About five months later, on May 25, 2016, Petitioner visited OLV Family Care Center; the reason for her appointment was listed as "right foot – hard area and at times swells under toes – the more she is on her feet the more it hurts."  Ex. 4 at 8.  FNP Minazzi assessed Ms. Smith as having right foot pain, and provided her with a referral to podiatry.  *Id.* at 9.  There is no annotation in the medical records that Petitioner mentioned arm or shoulder pain during this visit.

On June 23, 2016, Petitioner went to see FNP Minazzi for left arm pain.  Ex. 4 at 5.  The HPI section of the record indicates, "left arm pain and states achy since she got fluvax in [S]eptember[;] states [it] hurt ever since [and] now states pain in shoulder [is the] only thing related[;] states she can not hang things at work [be]cause she can not lift [her] arm."  *Id.*

On July 11, 2016, Petitioner presented to Ascend Physical Therapy for an initial examination.  During that visit, she told the physical therapist that she had right dorsal foot pain with pain and swelling after prolonged standing.  Petitioner also complained of left shoulder pain "worsening over the last two years."  Ex. 4 at 121.  She was assessed with clinical signs of left shoulder impingement.  *Id.* at 122.

On August 2, 2016, Petitioner visited Surgical Associates and presented "with pain and a possible mass in her left upper arm."  Ex. 2 at 1.  The musculoskeletal section in that record states "Tender left upper lateral arm.  No definitive masses."  *Id.*  The record goes on to state:

4

> 57 year old female with 2 years of pain in her left upper arm. She reports that this started after a flu shot in 2014. She has no associated symptoms. I cannot palpate a definitive mass and her arm is grossly symmetric with the right which is non tender. It is possible she may have developed a hematoma that is now a scar from her flu shot.

*Id.* at 2. Dr. Johnson noted in the record that he would arrange for a left arm ultrasound to evaluate for a potential mass. *Id.*

Petitioner visited Excelsior Orthopaedics on August 15, 2016. During this visit, Petitioner reported that "her symptoms began [on] October 16, 2014. She states she got a flu shot and it hasn't stopped hurting since." Ex. 4 at 111. She was assessed with pain in the left shoulder and impingement syndrome of the left shoulder. Ex. 3 at 7.

On August 16, 2016, Petitioner underwent an ultrasound of her left upper arm. The clinical indication for the procedure was noted as "left upper arm pain for 2 years after a flu shot in 2014." Ex. 2 at 3. Dr. Johnson interpreted the results of this ultrasound in a note to Dr. Matthews, and stated that "there was no mass present." *Id.* Dr. Johnson further stated, "I expect the pain must be arthritic or musculoskeletal." *Id.*

### III. The Petition, Affidavits, and Documentary Evidence

The Petition filed in this matter states that Petitioner experienced a left shoulder injury immediately following her October 16, 2014 vaccination. Petition at 1.

#### A. Affidavits

##### 1. Affidavit of Ms. Smith

In support of her Petition, Ms. Smith signed her first affidavit on March 13, 2017. In it, she states that she developed a left shoulder injury "immediately" after she received her flu vaccination. Ex. 7 at 1. She additionally states that she suffered the residual effects of this injury for more than six months. *Id.*

##### 2. Second Affidavit of Ms. Smith

On November 8, 2017, Petitioner signed her second affidavit. In this document, she answered the questions posed by Special Master Moran. Ex. 10.

##### 3. Affidavit of Mr. Paul del Valle

Mr. Paul del Valle, Petitioner's son, signed his affidavit on March 22, 2018. He states that Petitioner called him on October 24, 2014 and told him that she was suffering from "intense pain and limited range of motion in her arm" and that she had been experiencing these symptoms

starting immediately after receiving her flu vaccination on October 16, 2014. Ex. 11 at 1. He remembers the date of the phone call because October 24th is his son's birthday. *Id.*

Mr. del Valle told his mother she should go to the doctor. *Id.* at 2. According to Mr. del Valle, she said she hoped the injury would go away on its own, and did not seek medical attention for her condition. *Id.* Mr. del Valle stated that his mother's shoulder injury continues to bother her to this day. *Id.*

### 4. Affidavit of Ms. Maria Torres

Ms. Maria Torres, Petitioner's daughter, also submitted an affidavit in support of Petitioner's claim. In the document, she states that she and her five children were living with Ms. Smith in the autumn 2014 timeframe. Ex. 14 at 1. Ms. Torres describes her mother coming home the day she received her flu vaccination; according to Ms. Torres, Petitioner stated that her shoulder hurt and that the pain was "very intense." *Id.* Further, in the days following her vaccination, Ms. Torres describes Petitioner's pain as increasing. *Id.*

Ms. Torres also states that Petitioner's ability to care for the two youngest children (then ages one and two) changed after her flu vaccination. *Id.* It became much more difficult for Petitioner to dress the children, bathe them, pick them up, and carry them. *Id.* at 2. According to Ms. Torres, Petitioner even began to shy away from physical contact with these two youngest children because she was concerned one of them would bump into her arm. *Id.*

Ms. Torres believes that her mother did not seek treatment for her shoulder injury due to family circumstances, her responsibilities caring for her grandchildren, and "her general tendency to put off going to the doctor." *Id.*

### B. Documentary Evidence

On August 13, 2018, Petitioner filed a Christmas card that she states she mailed to her son in late December of 2014. The inside of the card contains two handwritten notes. The first one reads, "Wishing you all a Happy 2015 I love all you guys Miss you all! Love, Mom". The note on the top portion of the card states, "P.S. I'm sorry that this card is so late with everything that's going on and trying to deal with this arm pain I'm overwhelmed. I'll call you soon." Exs. 15, 16. Petitioner filed writing samples (Exs. 17, 18). She filed payroll paperwork that Mr. del Valle discussed in his testimony at the hearing (Ex. 19) and a group of Christmas cards (Exs. 20, 21).

### C. Testimony at the Hearing

#### 1. Testimony of Petitioner

Petitioner testified that she received her flu vaccine on October 16, 2014 in her left arm. Tr. at 6. She described feeling immediate pain in the center back of her deltoid. Tr. at 7. As time went on, Petitioner testified that her pain worsened. It began running down her arm, and causing her fingers to tingle. Tr. at 11.

6

During the 2014 and 2015 timeframe, Petitioner's daughter, Maria Torres, and Ms. Torres' five children were living with Petitioner. Tr. at 11-12. Petitioner's grandchildren ranged in age from one to 10 years. Tr. at 12. Since the two youngest were not in school, Petitioner spent the day caring for them. Tr. at 13. She stated that it was difficult for her to take care of them due to her arm pain. Tr. at 13-15.

Petitioner also testified that her continuing arm pain prevented her from going trick-or-treating with her grandchildren during Halloween. Tr. at 17. Additionally, she was unable to cook and decorate for Christmas in the way she had in the past. Tr. at 17-18.

Petitioner testified that she sent a Christmas card to her son, Paul, sometime after Christmas 2014, but before January 1, 2015. Tr. at 19-22, 38. The front of the card states, "Wishing you a happy 2015". Tr. at 20; Exs. 15, 16. The inside of the card contains two handwritten notes. The first one reads, "Wishing you all a Happy 2015 I love all you guys Miss you all! Love, Mom". The note on the top portion of the card states, "P.S. I'm sorry that this card is so late with everything that's going on and trying to deal with this arm pain I'm overwhelmed. I'll call you soon". Tr. at 20; Exs. 15, 16. Petitioner testified that she does not send out Christmas cards every year. Tr. at 39. She stated that she may have sent one to her best friend Vivian, but she is not sure. *Id.*

Petitioner testified that she went to a medical appointment on August 3, 2015, in order to follow-up on some blood work. Tr. at 23. While at that appointment, Petitioner claims she told FNP Danielle Minazzi, "I'm still having pain in my arm from the flu shot that I had in October." Tr. at 24. According to Petitioner, FNP Minazzi told her that was not possible. *Id.*

Petitioner also discussed her medical visit to the emergency room on August 6, 2015. Tr. at 26. She was working at Mercy Hospital and lifted a heavy laundry bag. *Id.* The act of lifting the bag caused her to hurt her neck. *Id.* Petitioner identified the location of her neck pain as "right in the middle of my neck." *Id.* When asked by her lawyer why she did not mention her shoulder pain during this medical visit, Petitioner stated, "Because I wasn't there for my shoulder; I hurt my neck." Tr. at 27.

Petitioner testified that she did not seek immediate attention for her arm/shoulder pain. "I considered it, but I was so busy with everything going on in my life at the time that I just kept dealing with the pain and was trying to take care of everything else that needed to be taken care of." Tr. at 34.

Petitioner described her pain as worsening with time. Tr. at 19. When asked about the winter 2014-2015 timeframe, she stated, "It went from my arm into my shoulder more." *Id.* I asked Petitioner some additional questions about her pain. Tr. at 36-37. She testified that her pain started in the lower to the middle part of her deltoid. Tr. at 37. She further stated that as time went by, the pain started going into her shoulder. *Id.*

**Q.** When did the pain start going into your shoulder?

**A.** I'm not exactly sure, but I believe it was in 2000 – in the early 2016.

*Id.*

### 2. **Testimony of Ms. Maria Torres**

Ms. Maria Torres testified that she and her five children were living with Petitioner in the October 2014 timeframe. Tr. at 41. While they were living together, Ms. Torres worked during the week from 9:00 until 2:00, and during that time, Petitioner watched the children. Tr. at 43.

Ms. Torres testified that she remembers the day Petitioner received her flu shot. Petitioner came home and asked Ms. Torres to look at her arm and check for a bruise. Petitioner told Ms. Torres that her arm hurt. Tr. at 43-44. Ms. Torres testified that she observed a change in her mother's behavior due to her arm pain. Tr. at 45. After the flu shot, Petitioner had difficulty lifting and carrying her grandchildren. Tr. at 45-46. She also could not decorate the house for the holidays, cook the holiday meal, or maintain her regular schedule of grocery shopping. Tr. at 48-50, 52-53.

Ms. Torres testified that Petitioner did not seek medical attention for her arm pain because she was concerned the doctor would say there was something seriously wrong, and also because she thought the pain would go away on its own. Tr. at 55-56. Ms. Torres described Petitioner as having a hard knot in her arm ("she thinks it's permanent and she mentions how it's hard and -- it's hard in there all the time"). Tr. at 55. Ms. Torres described the location of Petitioner's pain as ranging from her arm to her shoulder ("The arm muscle to the top of the shoulder, in that area"). Tr. at 66.

### 3. **Testimony of Mr. Paul del Valle**

Mr. Paul del Valle, Petitioner's oldest son, lives with his wife and three children in Odessa, Texas. Tr. at 71, 73. He testified that he remembers speaking with Petitioner by telephone on October 24, 2014. Tr. at 73. She called because it was his middle child's birthday. *Id.* Mr. del Valle testified that during this conversation, Petitioner said that she had been having pain in her arm that may have been caused by the flu shot she had received the week prior. Tr. at 75. According to Mr. del Valle, Petitioner could not think of anything else that could be causing her pain, and the pain "started in the spot that she had received the shot." Tr. at 75-76. Petitioner told Mr. del Valle that the pain in her arm started "a few days after the flu shot." Tr. at 75. Mr. del Valle testified that he told his mother she should see a doctor. Tr. at 76.

Mr. del Valle also testified that his mother sent him a Christmas card in late 2014. Tr. at 79. He stated that he and his wife keep approximately eight to 12 cards from family members in a file box in their house. Tr. at 95, 99. Of those eight to 12 cards, around three to six are from Petitioner. Tr. at 97. Mr. del Valle testified that his wife found a card from Petitioner (submitted into evidence as Ex. 16) when she was looking through the file for some payroll paperwork. Tr. at 95.

According to Mr. del Valle, Petitioner's arm still hurts today. Tr. at 86. He testified as follows: "she was showing me the spot in her arm is really hard where she got the flu shot at and it's not like the rest of her arm." *Id.*

8

**IV. Legal Standards Regarding Fact Finding**

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant

time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

**IV. Findings of Fact**

In order to overcome the presumption that contemporaneous written medical records are accurate, testimony must be "consistent, clear, cogent, and compelling." *Blutstein*, 1998 WL 408611, at *5. Because of this presumption, "special masters in this Program have traditionally declined to credit later testimony over contemporaneous records." *Sturdivant v. Sec'y of Health & Human Servs.,* No. 07-788V, 2016 WL 552529, at *15 (Fed. Cl. Spec. Mstr. Jan. 21, 2016). *See, e.g., Stevens v. Sec'y of Health & Human Servs.*, No. 90–221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990); *see also Vergara v. Sec'y of Health & Human Servs.*, No. 08–882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. Jul. 17, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); *See also, Cucuras*, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight").

There are two factual issues to be determined in this case: the location of Petitioner's pain, and its date of onset.

    **A. Location of Pain**

During her testimony at the hearing, Petitioner consistently described her initial pain as arm pain. At the very beginning of her testimony, she stated that the pain began in her upper arm. Tr. at 7. In fact, Petitioner did not describe shoulder pain when discussing the onset of her symptoms.[3]

Mr. Vuckovich asked Petitioner about her initial symptoms:

**Q.** After you received the vaccination in October 2014, you previously testified that you experienced left arm pain. Did that pain extend anywhere other than your arm, for instance, your neck or your back?

---

[3] *See* Tr. at 11 ("the pain was running down my arm and my fingers were tingling); Tr. at 15 ("Well, it was hard to take care of [my grandchildren] because of the arm pain" and "be careful, J*, watch grandma's arm."); Tr. at 15-16 ("I've always had to be cautious of my arm so they don't bump into it because it was already sore and I didn't want them to – you know, they're – when they were playing, I didn't want them to hit my arm."); Tr. at 17 ("So it was kind of hard to push her around in the wheelchair with my arm like that.").

**A.** No, just my arm -- down my arm and -- down my arm.

Tr. at 33.

Petitioner did testify that the pain moved up into her shoulder at some point in time. When asked during her direct examination to describe the "change in [her] shoulder symptoms" during the winter of 2015, Petitioner stated that "It went from my arm into my shoulder more." Tr. at 18.

I followed up on Mr. Vuckovich's questions regarding progression of pain:

**Q.** Can you show me where the pain in your arm started and where it went to?

**A.** It's -- if I press on it right here, it still hurts right here (indicating). It's real sore within this area.

**Q.** So is that -- kind of fair to say that that -- to me what that looks like is the lower part of your deltoid, maybe the middle of your deltoid?

**A.** Yes.

**Q.** Is that what you're touching?

**A.** I believe so. And it just my whole arm hurted. My arm felt so heavy at first and my fingers used to tingle. The only thing that I don't get anymore is my fingers don't tingle anymore. But as time went by, it started going into my shoulder and then I realized that I couldn't lift my arm as good as I used to and I couldn't lift my arm over my head.

**Q.** When did the pain start going into your shoulder?

**A.** I'm not exactly sure, but I believe it was in 2000 -- in the early 2016.

**Q.** In early 2016 or '15? I'm sorry, I didn't hear you.

**A.** I believe it -- I believe it was in 2016.

Tr. at 36-37.

Petitioner's testimony that she experienced arm pain for the most part is corroborated by the contemporaneous medical records. November 16, 2015 is the first time arm pain associated with flu vaccination is mentioned in the records.[4] On June 23, 2016, Petitioner described left arm

---

[4] The record from this visit reads as follows: "states left arm pain in muscle states pain since feels a lump." Ex. 4 at 15. Although this notation does not say "pain since flu vaccination", I find there is preponderant evidence that this is the proper reading of the record. (In other words, this is what Petitioner told the medical providers on this date). This reported injury is consistent with Petitioner's later representations about a

11

pain since flu vaccination. Ex. 4 at 5. On August 2, 2016, she complained of pain and a possible mass in her upper arm. Ex. 2 at 1. Due to these complaints, Petitioner's doctor ordered an ultrasound of her left upper arm. Ex. 2 at 3. Although several of the records indicate an assessment of left shoulder pain (Ex. 3 at 7; Ex. 4 at 121), the majority of Petitioner's complaints concern pain in her arm. The records that do reference shoulder pain are in the summer 2016 timeframe.

Since Petitioner has alleged a SIRVA injury, the specific location of her pain is significant. According to the Qualifications and Aids to Interpretation (QAI):

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.

42 C.F.R. §100.3(c)(10).

Petitioner testified that the pain she attributes to her October 16, 2014 flu vaccination was in the middle of her deltoid. This is the location where the vaccine is supposed to be administered. Petitioner's testimony regarding the location of her pain is consistent with the medical records in this case. Both lead me to conclude that Petitioner experienced arm pain (pain in the middle of her deltoid) and not shoulder pain.

## B. Date of Onset

The medical records in this case demonstrate that Petitioner began to experience arm pain in November of 2015. In fact, the medical appointment from November 16, 2015 is the first time that Petitioner saw a doctor for arm pain. Ex. 4 at 15.

Although Petitioner states in her affidavit that the onset of her pain was immediate, the contemporaneous medical records do not support this assertion. First, Petitioner did not go to see a doctor from the date of her vaccination, October 16, 2014, until August 3, 2015, more than 9.5 month later. She made no mention of shoulder pain (or arm pain) at this August appointment. *See* Ex. 4 at 18. Three days later, on August 6, 2015, Petitioner went to the ED after straining her neck lifting a heavy bag of linens. Ex. 13 at 20. The notes from this visit specifically indicate, "[p]atient reports she had no pain at the time she was lifting the bag" and "[n]o tenderness or pain in the left shoulder." *Id.* at 20-21. In all, Petitioner went to at least five medical appointments from August

---

painful lump in her arm being associated with her flu vaccination. *See* Ex. 4 at 5, where Petitioner reported pain since flu vaccination; Ex. 4 at 121, Petitioner complained of left shoulder pain worsening over the past two years; Ex. 4 at 15, medical visit where Petitioner presented with pain and a possible mass in her left upper arm, present since flu vaccination.

3, 2015 until the date she reported arm pain on November 16, 2015.[5] She did not report shoulder or arm pain at any of these visits until her medical appointment on November 16, 2015.

In making these factual determinations, I have concluded that the medical records and medical histories, provided close-in-time to Petitioner's injury, more accurately reflect her contemporaneous symptoms, and thus are more persuasive than the affidavits, testimony, and other evidence[6] presented by Ms. Smith and her family members between two and nearly four years after the fact.

Ultimately, the weight of the evidence in this case demonstrates that Petitioner began experiencing symptoms of left arm pain in November of 2015. Petitioner's testimony, affidavits, and other documentary evidence in the face of contrary contemporaneous medical record evidence do not carry her burden of persuasion.

**V. Conclusion**

I find that Petitioner began to experience symptoms of left arm pain in November of 2015.

The following is therefore ORDERED:

By no later than Monday, January 21, 2019, Petitioner shall file either an expert report supporting onset of left arm pain 13 months after flu vaccination, or a status report indicating how she intends to proceed.

**IT IS SO ORDERED.**

**s/Katherine E. Oler**
Katherine E. Oler
Special Master

---

[5] *See* Ex. 4 at 18, medical appointment on August 3, 2015; Ex. 13 at 20, medical appointment on August 6, 2015; Ex. 4 at 94-95, August 19, 2015 mammogram; and Ex. 5 at 7, October 8, 2015 mammogram.

[6] In reaching this conclusion, I considered the Christmas card that Petitioner purportedly sent to her son, Mr. del Valle in late 2014. Ultimately, after considering all the evidence in the case, to include the fact that there is no way to objectively verify when and whether the card was sent, I find the card's persuasive value to be low. It does not rise to the level of objective contemporaneous evidence.